| | |
|---|---|
| JOHN W. WITTMAN, on behalf of the Voith Retirement Savings Plan for Bargaining Unit Employees and all other similarly situated ERISA-covered employee pension benefit plans, | Civil Action No. **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| vs. | |
| NEW YORK LIFE INSURANCE COMPANY, | |
| Defendant. | |

## COMPLAINT

Plaintiff, John W. Wittman, by his attorneys, on behalf of the Voith Retirement Savings Plan for Bargaining Unit Employees and all other similarly situated ERISA-covered employee pension benefit plans, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of counsel as to all other allegations, alleges the following Complaint.

## I.     INTRODUCTION

1.      This is a class action against New York Life Insurance Company ("NYL" or "Defendant").

2.      NYL sells group annuity contracts to retirement plans. These contracts include "Stable Value Funds" ("SVAs"). SVAs periodically credit a certain amount of income to retirement plans and the participants in such plans who invest their retirement plan accounts in SVAs. This income, generally expressed as a percentage of the invested capital, is determined pursuant to the Crediting Rate. The Crediting Rate is set for each

Crediting Period, often 3-6 months, and varies in each Crediting Period. NYL sets a Crediting Rate for all money added to its SVAs in each Crediting Period.

3.        NYL has the sole and exclusive discretion to determine the Crediting Rate for a given Crediting Period. NYL sets the Crediting Rate well below its internal rate of return ("IRR") on the invested capital it holds through the SVAs. Thus, NYL guarantees a substantial profit for itself. NYL does not disclose to its retirement plan clients and their respective participants the difference between its IRR and the Crediting Rate. Thus, NYL collects tens of millions of dollars annually in undisclosed compensation from the retirement plans and participants to whom it owes the highest duties known to law, in violation of ERISA and statutory disclosure obligations.

## II.        JURISDICTION AND VENUE

4.        This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

5.        This court has personal jurisdiction over Defendant because it is headquartered and transacts business in and has significant contacts with this District, and because ERISA provides for nationwide service of process. This Court also has personal jurisdiction over Defendant pursuant to Fed. R Civ. P. 4(k)(1)(A) because it would be subject to the jurisdiction of a court of general jurisdiction in New York.

6.        Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides or may be found in this District. Venue is also proper in this District

pursuant to 28 U.S.C. § 1391 because Defendant resides and does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     <u>PARTIES</u>

7.    Plaintiff John W. Wittman is a citizen and resident of Appleton, Wisconsin. Plaintiff is a participant in the Voith Retirement Savings Plan for Bargaining Unit Employees ("the Plan"). All retirement plans within the Class defined herein are referred to as "the Plans."

8.    Defendant NYL is a legal reserve insurance company authorized under the insurance laws of New York. Its principal place of business is New York, NY.

## IV.     <u>SUBSTANTIVE ALLEGATIONS</u>

9.    Pursuant to its insurance business, Defendant offers and sells to the Plans Group Annuity Contracts ("GACs") which include SVAs managed through Defendant's general investment account ("GIA") and through its guaranteed separate accounts ("GSA").

10.    The SVAs are offered to ERISA-covered Internal Revenue Code ("Code") retirement plans.

11.    Plaintiff invests his retirement assets in Defendant's SVA through the Plan.

12.    The SVAs are intended to provide investment income to the Plans' participants as participant assets grow through interest and additional contributions.

**A.    Defendant Is a Fiduciary.**

**1.    Defendant Is a Fiduciary in Setting Crediting Rates.**

13.    Defendant, through its specialized professionals, developed the GAC terms through which the SVAs are provided to the Plans and their participants.

14.     Defendant reserves to itself, under the GACs, substantial authority to protect its own interests at the expense of the Plans.

15.     For example, the terms of the GIA specifically state that "New York Life may ignore such (participant) withdrawal and transfer requests if New York Life determines that making such withdrawals and transfers would have a potential adverse financial, legal or administrative impact on the obligations of New York Life under this Contract."

16.     Defendant imposes substantial restrictions on transfers from the SVAs to other investment options. Any transfer from the SVAs to a competing investment option must be invested in a non-competing option for a minimum period of time. Defendant determines in its sole discretion the competing options and discloses only that they "may include money market funds, short-term bond funds, and self-directed brokerage options." In other words, as Defendant explains in its Actuarial Memorandum to one GAC, all transfers "are subject to a 90-day equity wash," which forces participants who want to transfer out of the SVAs to invest the most low-risk, stable value, portions of their retirement savings in much higher risk equity investments.

17.     Defendant imposes substantial penalties upon participants if an employer terminates a GAC. For example, under its GIA, upon notice of termination, Defendant immediately reduces the Crediting Rate for the remainder of the period it continues to hold a participant's retirement assets. In addition to this penalty, Defendant requires either that a participant's retirement assets be paid out over 6 years, or it imposes a second penalty on top of the first through what it calls a "market value adjustment." This market value adjustment reduces the amount of any lump sum payment a participant may elect to receive

in the event that he or she does not want to wait for a 6-year payout. The market value adjustment is punitive, and not related to a true economic market value, and Defendant can determine the amount of this penalty in the range from 1% to 7%. While the market value adjustment is purportedly determined under a formula, that formula is computed in such a way as to effectively reserve to Defendant the discretion to determine the amount of the adjustment. As a final protection for itself, Defendant reserves to itself, in its sole discretion, the right to pay out at book value if the market value adjustment is more favorable to the Plan or participant.

18.     As a further example of the substantial penalties imposed upon participants if an employer terminates a GAC, Defendant imposes a punitive market value adjustment if an employer terminates a GAC with a GSA. This market value adjustment involves a reduction in the amount invested in a participant's account based on the interest rate paid on long term BBB rated industrial new issue bonds. The assets underlying the GSA, however, have a much higher credit rating. Accordingly, the market value adjustment reduces retirement assets based on assets that are substantially riskier and have substantially lower credit ratings than the assets actually held in the GSA.  The adjustment, then, is not based on the actual risk of the portfolio and substantially exceeds the actual risk to Defendant. t. This means that the market value adjustment will always be punitive. For example, in one of its disclosures for 401(k) plan participants, the gross Crediting Rate is 1.62%, but the market value adjustment rate is 4.83%. Accordingly, Defendant is penalizing withdrawals at the rate of 3.21%. Since it applies this penalty rate over two years, in Defendant's example, the withdrawal penalty is over 6%. Had Defendant made a

market value adjustment based on the rates in an analogous stable value market, the penalty would have been substantially lower.

19. Defendant reserves to itself the right to impose substantial economic penalties under the GACs should the Plans not notify the Defendant "as soon as reasonably possible" (but with at least 30 to 120 days' notice) of such routine Plan changes as altering the Plan sponsors' contributions to a Plan, a change in Plan investment options and a change in a Plan service provider (including the recordkeeper, trustee or "any other" service provider).

20. Participant and Plan deposits to the SVAs accumulate at an interest rate set and reset by Defendant.

21. Defendant sets and resets the interest rate (the "Crediting Rate") for the SVAs as often as every quarter.

22. Defendant sets the gross Crediting Rate (before the deduction of expenses) for the GIAs in its sole discretion, subject only to a statutorily required minimum guaranteed crediting rate, which, under certain SVAs, may be as low as 0%, before the deduction of expenses.

23. According to Defendant's Actuarial Memorandum for a GIA, the cost of this guarantee of a participant's principal, accumulated interest, a minimum Crediting Rate and a guaranteed Crediting Rate for six months is only .15%. In other words, the guarantee under the SVAs has virtually no material value. Where the guaranteed minimum interest rate is 0%, the guarantee is absolutely worthless.

24. Defendant is required to provide only a 15 day notice prior to resetting the GIA Crediting Rate, yet requires a 30 day minimum notice of termination to the Defendant

if the rate is unfavorable. Accordingly, a Plan cannot reasonably terminate a GIA if Defendant imposes an unfavorable Crediting Rate. Further, as alleged above, Defendant imposes substantial penalties on the Plans should the Plans attempt to terminate the GIA because of an unfavorable rate. Moreover, 15 days is a grossly insufficient period of time for the Plans to make a determination on the acceptability of the Crediting Rate, and to research and replace the GIA with another stable value fund.

25.     Defendant sets the gross Crediting Rate for the GSA "based on the investment experience" of Separate Account 25. But it does not define "investment experience" or disclose how or to what extent the gross crediting interest rate is "based on" that experience.

26.     Though the GSA does not require any prior notice to the Plans or the participants of actual changes in the Crediting Rate, Defendant, as alleged above, imposes substantial penalties on the Plans should the Plans attempt to terminate the GSA because of an unfavorable rate.

27.     The SVAs do not specify or require any formula or methodology for determining the SVA gross Crediting Rates, and Defendant does not disclose any actual formula or methodology used for determining the gross Crediting Rates. Accordingly, Defendant sets the gross Crediting Rate for the SVAs in its sole discretion.

28.     Defendant, through its management and Board of Directors, has the complete and unfettered discretion to set the Crediting Rate above the guaranteed amount. Accordingly, Defendant, through its management and Board of Directors, has the complete and unfettered discretion to determine the earnings that are paid out on the SVAs.

29.     By setting the SVA Crediting Rates, as more fully alleged below, Defendant impermissibly sets its own compensation.

30.     The restrictions and penalties alleged above cause the Plans to be locked into unreasonable Crediting Rates, SVAs and GACs. In locking Plans into the SVAs, over which the Defendant retains the authority to establish the Crediting Rates, Defendant acts as a fiduciary in setting the SVA Crediting Rates.

### 2.     Defendant Is a Fiduciary in Managing Plan Assets Deposited In SVAs.

#### a.     Defendant Is a Fiduciary In Management of GIA Deposits.

31.      Participant contributions to the GIA are received by Defendant and deposited in Defendant's general account, where they are held, pooled and invested by Defendant with Defendant's other financial assets, which Defendant reports as "Invested Assets."[1]

32.     Defendant identifies and markets the asset classes in which these Invested Assets are invested, the allocation among asset classes and the investment returns on the Invested Assets.

33.     Defendant markets the GIA exclusively as an investment vehicle which provides to the Plans a low volatility "stable value" investment option.

34.     Defendant, under the GIA, provides the Plans with a guarantee of principal, a guaranteed minimum Crediting Rate and a discretionary Crediting Rate above the

---

[1] According to the GACs, Defendant assigns Plan contributions to a particular Invested Asset portfolio for contracts in its "Class of Contracts," where each security in that portfolio has a weight determined as the fair market value of the security divided by the fair market value of the asset portfolio for contracts in its Class of Contracts.

guaranteed minimum rate. All of these elements are components of the GAC. Each must be independently examined to determine whether the GAC is a guaranteed benefit policy.

35.     In setting the discretionary Crediting Rate, Defendant takes into account its investment experience of the Invested Assets in its general account. Accordingly, the Crediting Rate above the guaranteed rate fluctuates based on the investment experience of Defendant's general account. Since, as alleged above, the guarantee has no material value, all of the material investment risk of the GACs is allocated to the Plans.

36.     The Crediting Rate above the guaranteed minimum is a non-guaranteed component of the GAC. Since Defendant offers a discretionary Crediting Rate, the GAC is not a guaranteed benefit policy.

37.     Defendant's Invested Assets, which are factored into computation of the Crediting Rate in its general account and are connected with the non-guaranteed component of the GIA, are considered Plan assets under ERISA, and Defendant is a fiduciary of the Plans in its discretionary handling and management of those Plan assets.

**b.     Defendant is a Fiduciary in Management of GSA Deposits.**

38.     Participant allocations to the GSA are received by Defendant and deposited and held by Defendant in Defendant's Separate Account 25, where they are pooled and invested with the other financial assets in that Account.

39.     Separate Account 25 is an insurance company separate account under 29 C.F.R. § 2510.3-101(h)(3), and the assets which the Plans deposit and Defendant holds in that account and income earned thereon are Plan assets under ERISA.

40.     Defendant specifically identifies and markets the asset classes in which the Separate Account assets are invested, the allocation among these investment classes and the investment returns on these assets.

41.     Defendant's discretionary handling and management of GSA assets makes Defendant a fiduciary of the Plans with regard to those assets.

42.     Because Defendant does not directly allocate the investment returns of Separate Account 25 to the Plans, it is managing the Plans' assets solely for its own behalf.

**B.      Defendant Exercises its SVA Fiduciary Authority To Set Unreasonable Compensation in Violation of ERISA.**

43.     The GACs are the Plans' assets.

44.     Defendant is a fiduciary concerning the GACs.

45.     Plan fiduciaries may not set their own compensation under ERISA.

46.     In 2014, Defendant reported that the gross Crediting Rate for the GIA was 2.6% for the first half of the year, and 2.45% for the second half of the year.

47.     In 2014, the average gross Crediting Rate for the GSA was 2.17%.

48.     Defendant imposed "expense" charges ranging from .10 to .75% for the GIA, and from .35 to .90% for the GSA, which were directly deducted from the SVAs, which had the effect of sharply reducing the Crediting Rates.

49.     In addition to these substantial fees, according to the Defendant's Actuarial Memorandum related to the SVAs, Defendant pays itself a "pricing spread" which is "intended to cover investment management and administrative expenses, as well as expenses for risk and profit."

50.     According to Defendant's Actuarial Memorandum, the "spread" is "the difference between the actual earnings on investments made by the insurer [Defendant] and the Crediting Rate guaranteed to participants for that period."

51.     Defendant, through its management and Board of Directors, has the complete and unfettered discretion to determine the Crediting Rate and, therefore, the spread.

52.     Although Defendant discloses to fiduciaries certain specifically identifiable expense charges that it collects from the SVAs, it does not disclose the spread compensation it receives which reduces the investment returns earned by Plans and participants invested in the SVAs.

53.     Defendant earns direct and indirect compensation in the form of the spread connected to Plan deposits to the SVAs.

54.     Because Defendant in its sole fiduciary discretion sets the SVA Crediting Rate, and because the spread above the Crediting Rate is profit to Defendant, in exercising its fiduciary discretion to set the spread Defendant exercises fiduciary discretion to set its compensation related to the Plan deposits into the SVAs.

55.     In 2014, Defendant reported that its Invested Assets in its general account were invested 46% in corporate bonds, 15% in U.S. government and agency securities, 11% in mortgage loans, 6% in mortgaged backed securities, 5% in asset backed securities, 5% in policy loans, and 12% in "other" such as equities. Of the fixed income securities, 93% were investment grade.

56.     In 2014, in its general account, Defendant earned net investment income of $5,402,243,491 on Invested Assets of $120,841,385,149 for a return of 4.47%.

57.     Therefore, in addition to all of the expenses it was paid as alleged above, Defendant earned undisclosed spread compensation of between 1.87 % and 2.02% on the GIA.

58.     As of December 31, 2014, Defendant reports that it had $3.71 billion in the GIA. Therefore, Defendant, upon information and belief, earned approximately $74 million in spread from the GIA in 2014, alone.

59.     GSA Separate Account 25 was invested in largely the same way. In 2014, Separate Account 25 was invested 56.5% in corporate bonds, 21.7% in mortgaged backed securities, 10% in asset backed securities, 4.8% in collateralized mortgage obligations, 1.4% in U.S. government and agency securities and 5.6% in cash.

60.     Since Separate Account 25 was invested in approximately the same way as Defendant's general account, upon information and belief, it also earned approximately 4.47%.

61.     Therefore, in addition to all of the expenses it was paid, upon information and belief, Defendant earned a spread of approximately 2.3% on the GSA.

62.     At the beginning of 2014, Separate Account 25 had $3.6 billion in assets. Therefore, Defendant, upon information and belief, earned approximately $83 million in spread from the GSA in 2014, alone.

63.     Defendant did not disclose the amount of the spread it earned on the SVAs to Plan fiduciaries. Defendant's non-disclosure of the amount of the spread gave it a competitive advantage over other Plan service providers who disclosed all of their fees.

**C.      Defendant is a Party in Interest Receiving Undisclosed, Unreasonable Compensation Prohibited by ERISA.**

64.     Defendant is a party in interest to the Plans, and any compensation it receives from the Plans in connection with services provided to the Plans is prohibited by ERISA unless it is reasonable.

65.     For GACs in effect as of and after July 1, 2012, Defendant is a "covered service provider" under 29 C.F.R. § 2550.408b-2(c)(1)(iii)(C) as it provides insurance services to the Plans through the GACs, including by virtue of its insurance guarantees of principal of the SVAs through the GACs.

66.     In connection with its insurance services, Defendant reasonably expects to receive and receives indirect compensation in connection with receipt of the Plan deposits to the SVAs for which insurance services are provided.

67.     Defendant is also a "covered service provider" under 29 C.F.R. § 2550.408b-2(c)(1)(iii)(A) as it provides fiduciary services to the Plans by virtue of managing SVA assets through the GACs, and reasonably expects to receive and receives direct compensation in connection with its investment of the Plan deposits to the SVAs for which fiduciary services are provided.

68.     According to the Defendant's Actuarial Memorandum related to the GACs, Defendant pays itself a "pricing spread" from this investment income which is "intended to cover investment management and administrative expenses, as well as expenses for risk and profit."

69.     This pricing spread constitutes indirect compensation as defined in 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(2) in connection with its insurance services provided under the GACs, and direct compensation as defined in 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(1) in connection with its fiduciary services provided under the GACs.

70.     Compensation from a Plan under ERISA is not reasonable unless it is disclosed prior to entering into the contract for services.

71.     In order for its compensation to be reasonable, Defendant was required to disclose to each of the Plans' "responsible plan fiduciary" the amount of the spread on the later of July 1, 2012 or the date the Plan purchased the GAC. For GACs in effect prior to July 1, 2012, Defendant was required to disclose the compensation it received in connection with the services provided to the Plans under the DOL regulations then in effect.

72.     Defendant failed to adequately disclose its SVA spread to the Plans, and its receipt was therefore prohibited by ERISA as *per* se unreasonable.

## V.     CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Plan and the class (the "Class") defined as follows:

> All ERISA covered employee pension benefit plans whose plan assets were invested in New York Life Insurance Company's Group Annuity Contract Stable Value Funds within the six years prior to, on or after December 8, 2015.

74.     The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes hundreds of Plans.

75.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendant as alleged herein, and all members of the Class are similarly affected by Defendant's wrongful conduct.

76.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

a. Whether Class members' defined contribution plan accounts invested in the GACs;

b. Whether Defendant was a fiduciary of the Plans;

c. Whether Defendant was a party in interest with respect to the Plans;

d. Whether Defendant breached its fiduciary duties in failing to comply with ERISA as set forth above;

e. Whether Defendant's acts as alleged above breached ERISA's prohibited transaction rules;

f. Whether monies received and retained by Defendant were Plan assets;

g. Whether an affirmative defense to a prohibited transaction claim applies and can be satisfied by Defendant; and

h. Whether Defendant's acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiff, on behalf of the Plan and the Class, are entitled.

77. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

78. Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the

Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

79.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

80.     In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF
### ERISA § 406(a)(C), 29 U.S.C. § 1106(a)(C)

81.     Plaintiff re-alleges and incorporates herein by reference all prior allegations of the Complaint.

82.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

83.     Defendant is a party in interest under ERISA in that it provided services to each of the Plans. ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

84.     Defendant is also a covered service provider.

85.     Defendant received compensation in the form of spread and a specific expense charge in exchange for the services it provided to the Plans pursuant to the GACs and, therefore the GACs violate this section of ERISA.

86.     The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2). Additionally, transactions after June 30, 2012 must meet the specific requirements 29 C.F.R. § 2550.408b-2.

87.     The compensation paid to Defendant was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) for the following reasons.

88.     First, as alleged above, Defendant failed to make disclosures concerning spread compensation.

89.     As a result of Defendant's failure to make such disclosures, the spread income is, as a matter of law, unreasonable compensation within the meaning of ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

90.     Second, the spread and expense compensation was excessive and unreasonable as a matter of fact in relation to the value of the services provided with regard to the SVAs in that the spread exceeded the agreed expenses.

91.     When compared to the expenses related to competing funds, the total compensation for the SVAs was excessive.

92.     Plaintiff and the Class have been damaged in the amount of the spread Defendant took in connection with the SVAs.

93.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any

provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

94.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to Plaintiff and the Class, including but not limited to the disgorgement by Defendant of its undisclosed, excessive, and unreasonable compensation.

## SECOND CLAIM FOR RELIEF
## ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1)

95.     Plaintiff re-alleges and incorporates herein by reference all prior allegations of the Complaint.

96.     ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), provides that a fiduciary shall not deal with plan assets in his own interest or for his own account.

97.     In setting and resetting the Crediting Rates applicable to the SVAs and setting the amount of and keeping the spread, and in determining the level of its own compensation, Defendant deals with the Plans' assets in its own interest or for its own account.

98.     Plaintiff and the Class have been damaged in the amount of the spread Defendant took in connection with the SVAs.

99.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further

provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

100. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

101. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

102. Plaintiff and the Class are entitled to recover the spread and other appropriate relief as a result of these violations.

## THIRD CLAIM FOR RELIEF
### ERISA § 404

103. Plaintiff re-alleges and incorporates herein by reference all prior allegations of the Complaint.

104. In setting and resetting the Crediting Rates applicable to the SVAs, and setting the amount of and keeping the spread, and in determining its own compensation, Defendant has breached its fiduciary duties to the Plans and their participants.

105. Plaintiff and the Class have been damaged in the amount of the spread Defendant took in connection with the SVAs.

106. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the

care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

107.     ERISA § 409, 29 § U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

108.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

109.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

110.     Plaintiff and the Class are entitled to recover the spread and other appropriate relief as a result of these violations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendant on all claims and requests that the Court award the following relief:

A.     Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from further violating the duties, responsibilities, and obligations imposed on it by ERISA, with respect to the Plans;

C.      Awarding, declaring or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper and such appropriate equitable relief as the Court may order, including damages, an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

D.      Awarding pre-judgment and post-judgment interest;

E.      Awarding to Plaintiff attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine.

DATED: December 8, 2015

Respectfully submitted:


s/ Kevin Barrett_____
Kevin Barrett
**BAILEY & GLASSER LLP**
137 Betsy Brown Road
Port Chester, NY 10573
Telephone: (646) 776-8580
kbarrett@baileyglasser.com

Gregory Y. Porter, *pro hac vice* to be filed
Ryan T. Jenny, *pro hac vice* to be filed
**BAILEY & GLASSER LLP**
1054 31st Street, NW
Suite 230
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com

rjenny@baileyglasser.com

Robert A. Izard
Mark P. Kindall
**IZARD NOBEL LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
rizard@izardnoble.com
mkindall@izardnoble.com

*Attorneys for Plaintiff John W. Wittman*